LYONS & FLOOD, LLP
65 W. 36th Street, 7th Floor
New York, NY 10018
(212) 594-2400

Attorneys for Defendant
MEDITERRANEAN SHIPPING COMPANY, S.A.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

LIBERTY MUTUAL GROUP INC.
as subrogee of BODGER SEEDS, LTD.,

                Plaintiff,

   - against -

MEDITERRANEAN SHIPPING COMPANY S.A.,

              Defendant,

---------------------------------------------------------X

ECF CASE

08 Civ. 00223 (JSR)

**SUPPLEMENTAL
AFFIRMATION OF CAPTAIN
V.S. PARANI IN SUPPORT OF
MSC'S MOTION FOR
SUMMARY JUDGMENT**

CAPTAIN V.S. PARANI affirms in response to plaintiff's opposition to
Defendant MSC's motion for summary judgment the following:

      1.    I am an employee of defendant MEDITERRANEAN SHIPPING
COMPANY, S.A. ("MSC") and hold the position of Safety and Quality Superintendent
in its Ship Management Department in Hong Kong, China. In my present position I am
responsible for planning, executing and monitoring safety and quality related issues as
well as operational issues for MSC's fleet of ocean going container vessels.

      2.    Before going to work for MSC, I sailed commercially for fourteen
(14) years and served aboard break-bulk vessels, bulk carriers, crude oil carriers and
container ships. Accordingly, I have personal knowledge of the facts contained herein.

      3.    Traditionally, cargoes such as rice and wheat (also seeds with
similar hygroscopic properties) were transported in break-bulk ships in bags loaded into

an entire ship's hold. Ventilation requirements were met by stowing the bags with 6 inch

ventilation channels at horizontal intervals of about 20 bags. Dunnage (wooden planks,

air filled bags, paper rolls, bamboo mats) was used to prevent bags coming into contact

with the ship's steel hull. The dunnage also absorbed any moisture and minimized carry

over of condensate (moisture) to the adjacent cargo. Mechanical or forced draught

ventilation was used to circulate the air within the holds. The hold covers were opened as

the sea condition permitted and this supplemented the ventilation arrangements to reduce

moisture.

4.    Ventilation requirements were determined by the following 'rule of

the thumb' – dew point in the hold less than dew point outside – ventilate holds, dew

point in the hold greater than outside dew point – restrict ventilation. The process

involved lowering a hygrometer or thermometer in the hold through the access hatch and

then comparing with the outside dew point (relative humidity).

5.    On break bulk ships, the cargo arrived to the pier in the form of

bags on trucks or trains which was then loaded on to the ship. The longshoremen stowed

the bags in the hold as per the instructions of the ship's officers and/ or the shipper's /

consignee's representative or 'supercargo' as he was commonly referred to. The ship's

officers or the supercargo could usually detect any apparent defects in the cargo coming

in (such as damp or torn bags, rusted steel etc.) and remark on the bill of lading

accordingly. Ventilation requirements as listed above would be planned by the ship's

officers.

6.    The advent of containerization provided a fast and reliable means

of transportation around the world; damages during handling, exposure to the elements,

and pilferage were considerably reduced. Reduction in the number of units handled also meant faster turnarounds and the shipping lines could provide better service to the clients but this also came with a shift in responsibilities for stowage and care of cargoes.

7.      Today the custom in the container shipping industry, and the custom and practice aboard MSC's vessels, is that the container is loaded or stuffed at the shipper's premises or at an inland depot and the container delivered to the carrier in a sealed condition. For full container loads, as in this case, there is no opportunity for the carrier to verify the quality and quantity of the contents inside. Therefore the clean bill of lading is usually issued as there is no means to gather evidence to the contrary.

8.      A modern ocean container vessel may carry up to 8000 containers and the properties of each and every cargo may not be familiar to the ocean carrier. It is the shipper's responsibility to load the cargo in the containers adequately and to advise the carrier of any special requirements.

9.      On modern container ships, a standard ISO container ("standard dry van container") is usually fitted with small ventilation holes or slots, the primary purpose of which is to simplify opening and closing of the containers by equalizing the pressure differentials on opening and closing of the container doors.

10.     These dry van containers do not have any ports from which to check the atmosphere inside the container. Hence, the ocean carrier has no way to monitor the temperature or the humidity levels inside these containers. As such, these containers are not ideal for carrying hygroscopic cargo such as flower seeds. Instead, controlled atmosphere containers (refrigerated containers) are more suitable for carriage

of this cargo. However, it is the shipper's obligation to request a refrigerated container and pay the additional freight associated with a refrigerated container.

11.    If the shipper elects to carry hygroscopic cargo, such as flower seeds, in a dry van container, generally absorbent material is usually placed between the cargo and the sides of the container as well on top of the cargo to minimize condensation damage. From a review of the survey reports in this case, there is no evidence of any lining on the sides as rust from the container walls appears to have deposited on the bags along with the condensation. Unfortunately the absence of lining could not be confirmed as the cargo was unloaded at the receiver's warehouse before the surveyors involvement in the case.

12.    As a general practice aboard MSC vessels and in accordance with the custom and practice in the industry, absent any special carrying instructions from the shipper, holds aboard container vessels are ventilated naturally or passively, rather than mechanically. Generally, a few vent flaps are located in the forward and aft section of each of the ship's holds. These vents are generally left open during a voyage except when the ship encounters rough weather and there is a possibility of seawater and/or seaspray ingress.

13.    The forced (mechanical) draught fans located in each hold are generally only used when the ship's crew enters the hold for the daily inspection of the tanktop or for any maintenance work. Some other reasons to mechanically ventilate include: to dissipate any hazardous or flammable vapors which may be emitted by a cargo due to its inherent property; to avoid the accumulation of water in the holds bilges;

when specific instructions are provided by a shipper and contained in a ship's manifest; or any other emergency which necessitates ventilating the hold.

14.    However, in any event, neither passive or mechanical ventilation would have served any practical purpose due to the size of the vessel's hold, the number of containers stored in each hold (a hundred or more) and the subject container's limited airways, which do not allow for appreciable ventilation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: August 27, 2008

_____
Captain V.S. Parani