UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LIBERTY MUTUAL GROUP INC.                          :
as subrogee of BODGER SEEDS, LTD.,                 :
                                                   :      08 Civ. 00223 (JSR)
                Plaintiff,                         :
                                                   :
        - against -                                :
                                                   :
MEDITERRANEAN SHIPPING COMPANY, S.A.                :      Before:
                                                   :      Hon. Jed S. Rakoff
                Defendant.                         :
------------------------------------------------------------------------X

**REPLY MEMORANDUM OF LAW OF DEFENDANT
MEDITERRANEAN SHIPPING COMPANY, S.A. IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

LYONS & FLOOD, LLP
Attorneys for Defendant
MEDITERRANEAN SHIPPING
COMPANY, S.A.
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 594-2400

**PRELIMINARY STATEMENT**

Defendant Mediterranean Shipping Company, S.A. ("MSC") submits this Reply Memorandum of Law in further support of its motion for summary judgment, together with the Affirmation of Edward P. Flood dated August 28, 2008 ("Flood Aff."), the Affirmation of Dominick Mecky dated August 27, 2008 ("Mecky Aff."), the Supplemental Affirmation of Captain V.S. Parani dated August 27, 2008 ("Supp. Parani Aff."), and the exhibits annexed thereto.

**FACTS**

MSC respectfully refers the Court to MSC's previously filed pleadings and affirmations and the newly filed Parani Supplemental Affirmation and Mecky Affirmation with respect to the facts generally and provides the following additional comments regarding certain factual allegations contained in Plaintiff's Memorandum in Opposition to MSC's Motion for Summary Judgment ("Pltf.'s Mem.").

Plaintiff notes that the MSC bill of lading contains the notation: "CLEAN ON BOARD" and states that "the seal on the container was the carrier's seal." (Pltf.'s Mem. at p. 1), implying that MSC or its agent loaded and sealed the container. This is not the case. MSC, through its Tanzanian agent, provided the shipper, Maua Arusha Ltd. ("Maua"), with an empty container and a seal. The evidence is clear that, as per the usual practice, Maua loaded (stuffed), locked, and sealed the container, without any participation by MSC or its agent. (Mecky Aff. at ¶ 7). Without having had an opportunity to view Maua's shipment, MSC and its agent, Seatrade Investment (EA), had no knowledge as to the shipment's condition at time of loading. Hence, plaintiff's reliance on the "CLEAN ON BOARD" notation to establish good order is misplaced. See MSC's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment

(MSC's Opp. Mem."), POINT I. In fact, neither shipper nor plaintiff, to date, have produced any documentation (pre-shipment surveys, pre-shipment inspection reports or the like) evidencing the condition of the flower seeds prior to shipment. Moreover, no test indicating the moisture content of the flower seeds prior to shipment were ever produced.

Contrary to the allegation on page 2 of Plaintiff's Opposition Memorandum, it is common knowledge within the shipping industry in Tanga that MSC employs a "feeder system" which requires numerous trans-shipment ports. Moreover, Maua having previously shipped other shipments of flower seeds aboard MSC vessels, knew that MSC employed a feeder system (use of trans-shipment ports serviced by additional MSC vessels) to deliver their cargoes at the time it booked the subject shipment. (Mecky Aff. at ¶¶ 2-4).

Plaintiff goes on to claim that the subject voyage was "unusually long for an organic cargo such as flower seeds," and plaintiff's surveyor opines that flower seeds are "only transported over a period of a few weeks at most." (Pltf.'s Mem. at p. 3). This unsubstantiated statement is also contrary to the evidence. The customary route to ship a container from Tanga to Long Beach, California is the Asian Route: Tanga to Dar es Salaam to Jeddah to Ningbo/Chaiwan to Long Beach aboard four or five different MSC vessels. The average length of such a voyage is 65-70 days. The alternative route, the European Route also involves numerous trans-shipment ports and takes roughly the same amount of time as the Asian Route (Mecky Aff. at ¶ 2). Additionally, all three of Maua's most recent shipments to Long Beach (the subject shipment and two subsequent shipments) took more than two (2) months, the most recent voyage, in fact, being slightly longer than the subject voyage – 82 days compared with 69[1] days. (Mecky Aff. at ¶ 8). It is worth mentioning that both subsequent recent shipments apparently

---

[1] Although in defendant's previous papers, the length of the subject voyage was characterized as being "approximately 75 days," the actual length of the voyage was 69 days. The bill of lading evidences the subject container was loaded on January 26, 2007, and the container was discharged in Long Beach on April 5, 2007.

2

arrived in good condition because no claim was ever been lodged with MSC or its agent in regard to these shipments. (Meck Aff. at ¶ 8).

## POINT I

### MSC HAS SUFFICIENTLY ESTABLISHED THAT THE DAMAGE TO THE CARGO WAS CAUSED BY SWEAT

Plaintiff attacks Captain Jolly's conclusion that the damage to the subject cargo was caused by moisture or sweat in the flower seeds, contending that Captain Jolly's Affidavit is contradicted by his own survey report and not supported by the evidence.

First, the totality of the evidence firmly establishes that the fresh water wetting was due to cargo sweat. See MSC's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment, POINT II.

Second, it is plaintiff's surveyor's findings that are contradictory and speculative. Capt. Jolly in his affirmation and supplemental affirmation concluded that the wetting observed on some of the bags was due to the cargo releasing, or sweating, its inherent moisture over the course of the voyage. (Jolly Aff. ¶ 8; Supp. Jolly Aff. ¶¶ 3 and 8). While agreeing with Capt. Jolly that some "condensation and/or sweating is normal and expected with organic cargoes …." during ocean transit (Berri Aff. ¶ 10), plaintiff's surveyor then confusingly contends that Capt. Jolly's conclusion that the cargo sweated during transit is pure speculation because there is no evidence of "excessive sweating" (Berri Aff. ¶¶ 5, 9-15). Apparently, according to plaintiff's surveyor, only "excessive seating," as opposed to "normal sweating," will lead to cargo getting wet during transit. Plaintiff's surveyor then goes on to claim, again without any evidence to substantiate his opinion, that if there was excessive wetting it must have been caused by an "abnormally lengthy" voyage during an "unusual route" from Tanzania to Long Beach (Berri Aff. ¶ 15) and that shipments of flower seeds" are usually delivered within a relatively short

3

period of time and only transported over a period of few weeks, at most." (Berri Aff. ¶ 12). These opinions are not supported by the evidence and are purely speculative – Maua used MSC to ship a number of their shipments of flower seeds to the United States and the customary route was the "Asian Route" (the route taken by the subject shipment) with an average voyage in excess of two months. (Mecky Aff. ¶¶ 2, 3 and 8).

Third, and most important, plaintiff has presented no alternative theory as to how the cargo got wet, other than by the cargo sweating during transit.

## POINT II

### MSC HAS SUFFICIENTLY ESTABLISHED THAT THE SWEAT WAS AN UNAVOIDABLE CONDITION

Plaintiff next argues that even if it is established that the cause of the damage to the cargo was sweat from the seeds themselves, nevertheless MSC cannot rely upon the peril of the sea COGSA exception to avoid liability, since MSC has not established that the sweat was an unavoidable condition. (Pltf.'s Mem. at pp. 7-8).

MSC concedes that it must establish that the sweat condition was unavoidable in order to rely upon the sweat as a peril of a sea under COGSA and therefore avoid liability. MSC further concedes, for the purposes of this motion, that in general, ventilation is a method of avoiding sweat/condensation damage to cargo.

However, MSC denies plaintiff's suggestion that no ventilation was employed aboard the MSC vessels which carried the cargo. According to Captain V.S. Parani, MSC's Safety and Quality Superintendent in its Ship Management Department, it is the custom and practice aboard MSC vessels, as well as the custom and practice in the industry, that absent any special carrying instructions from the shipper, holds aboard container vessels are ventilated naturally or passively, rather than mechanically. (Supp. Parani Aff. at ¶ 12). This is accomplished by leaving vent flaps

4

located in the forward and aft sections of the holds open, and these vent flaps are routinely left open except during rough weather conditions. (Supp. Parani Aff. at ¶ 12).

Captain Parani further explains that passive ventilation is employed aboard MSC's vessels (as opposed to mechanical ventilation) because the conditions in the holds aboard modern container ships are drastically different from the conditions in the holds of yester-year's bulk carrier, which carried break bulk cargoes. (Supp. Parani Aff. at ¶¶ 3-14).

On a break bulk ship, cargoes would be transported in individual packaging such as bags, which would be manually stowed in the hold. (Supp. Parani Aff. at ¶ 3). The stowage would include dunnage to absorb moisture and minimize contact with the ship's hull, and would be accomplished in a manner which permitted ventilation through the use of ventilation channels. (Supp. Parani Aff. at ¶ 3). The hold of a break bulk vessel would also employ mechanical or forced draught fans to actively circulate air within the hold and ventilate the cargo. (Supp. Parani Aff. at ¶ 3). In determining when to employ mechanical ventilation, the crew of a break bulk vessel would rely upon measurements of the dew point (or relative humidity) both inside and outside the holds. (Supp. Parani Aff. at ¶ 4).

By contrast, absent a specific request by a shipper, the only ventilation typically employed in the holds of modern containers ships is passive ventilation, *i.e.* permitting the natural flow of air in the hold. (Supp. Parani Aff. at ¶ 12). Although forced air exhaust fans exist in the holds of modern container ships, they are not used routinely for ventilation of containers. (Supp. Parani Aff. at ¶ 13). Rather such fans are only used when the ship's crew enters the hold in order to dissipate hazardous or flammable vapors, to make the hold a more comfortable environment for the ship's crew when the crew needs to access the hold, or for other reasons generally not related to ventilating the cargo. (Supp. Parani Aff. at ¶ 13).

Thus, contrary to plaintiff's assertion, MSC **did** employ ventilation in its holds aboard all of the vessels which carried the cargo, albeit passive ventilation, which is the present custom in the industry.

As Captain Parani explains, the reason mechanical ventilation is not routinely utilized in the holds of modern container ships is that, whereas traditional break bulk cargoes such as seeds would be contained in bags loaded in a ship's hold, and would thus, be directly exposed to the climatic conditions in the hold and capable of being readily ventilated, cargoes carried aboard modern container ships are generally stowed in sealed dry van containers (either 20' or 40' in length), which are generally designed to be impervious to the elements and are thus, less capable of being ventilated. (Supp. Parani Aff. at ¶ 9). In essence, the container itself prevents the contents from being effectively ventilated through the use of mechanical ventilation systems. Although there are small openings in a dry van container, these holes are not primarily designed for the ventilation of cargo, but rather for the equalization of pressure within and without the container to make it easier for the container to be opened. (Supp. Parani Aff. at ¶ 9). These designed holes are simply too small to permit any appreciable ventilation of the container's contents through the use of mechanical ventilation. (Supp. Parani Aff. at ¶ 14). (See Pltf.'s Opp. Mem., Berri Ex. B – the photographs attached to Capt. Jolly's Report.)

Therefore, even if mechanical ventilation had been employed aboard the vessels carrying the cargo (which would have been contrary to the custom and practice in the industry), the sweat damage still could not have been avoided because the amount of mechanical ventilation which would have entered this container would have been *de minimus*. Since the sweat damage to the seeds occurred despite the precautions taken by MSC, it is clear that the sweat damage was unavoidable and therefore, MSC is entitled to rely upon the peril of the sea COGSA exception.

6

In *Associated Metals & Minerals Corp. v. Etelae Suomin Laiva*, 858 F.2d 674 (11th Cir. Fla. 1988), a case on which plaintiff heavily relies, the Eleventh Circuit affirmed a district court's decision absolving a carrier's liability on similar grounds, on finding that "ventilation was impossible under the circumstances" and that there was no evidence "to suggest that the decision not to ventilate was negligent." *Associated Metals*, *supra*, 858 F.2d at 678. Similarly, in the instant case, plaintiff has presented no evidence that MSC's customary practice not to use mechanical ventilation, as per the custom in the industry, was negligent.

### POINT III

### REQUIRING A MODERN CONTAINER CARRIER SUCH AS MSC TO HAVE EXPERT KNOWLEDGE OF THE PROPERTIES OF ALL THE PRODUCTS IT CARRIES WOULD BE ONEROUS AND UNFAIR

Plaintiff further argues that MSC was required to know the special characteristics of the flower seeds. (Pltf.'s Mem. at pp. 9-11). MSC concedes that an ocean carrier has some obligation to ascertain the characteristics of the cargo it agrees to carry. *See*, *e.g.*, *Borgships Inc. v. Olin Chemicals Group*, 1997 U.S. Dist. LEXIS 3065 (S.D.N.Y. 1997). "This knowledge does not extend so far, however, as to charge the carrier with knowledge of which it could not reasonably have been aware." *Id.* at *10. The duty of a carrier is only to exercise reasonable care to acquaint themselves with the facts and to take reasonable precautions to protect the cargo. *Anderson v. Lorentzen*, 160 F.2d 173, 175 (2d Cir. 1947).

None of the cases cited by plaintiff are to the contrary. All of the cases cited by plaintiff deal with situations where the carrier was transporting a bulk cargo of predominantly a single type of product. *See*, *e.g.*, *Atlantic Banana Co. v. M.V. "Calanca"*, 342 F. Supp. 447 (S.D.N.Y. 1972) (bulk cargo of bananas carried aboard vessel specifically adapted for carriage of bananas); *New England Petroleum Co. v. O.T. Sonja*, 732 F. Supp. 1276 (S.D.N.Y. 1990) (bulk carriage of oil aboard a tanker); *General Foods Corp. v. United States*, 104 F. Supp. 629 (S.D.N.Y. 1952)

(bulk cargo of cocoa beans); *Associated Metals & Minerals Corp. v. Etelae Suomin Laiva*, 858 F.2d 674 (11th Cir. Fla. 1988) (steel coils not in containers); *Schnell v. The Vallescura*, 293 U.S. 296, 55 S. Ct. 194, 79 L. Ed. 373 (1934) (bulk cargo of onions); *Siderius, Inc. v. M.V. "Amilla"*, 880 F.2d 662 (2d Cir. 1989) (steel coils not in containers).

In the instant case, the subject cargo was but a single container among thousands of containers being carried by MSC, each container potentially involving an entirely different product from its neighbor. (Supp. Parani Aff. at ¶ 8). Thus, in such a context – that of a modern container carrier – MSC contends that would be patently unreasonable to be charged with the obligation of having knowledge of the special characteristics of each type of product being carried. While imputing knowledge of the cargo's properties to the carrier may be appropriate in cases where the carrier is shipping one or two cargos known to require special care, when the cargo is one among a thousand containers aboard a vessel, that burden is onerous and unfair. *See Sunpride (Cape) (PTY) Ltd. v. Mediterranean Shipping Co., S.A.*, 2003 U.S. Dist. LEXIS 20333, 2004 AMC 1, 65 (S.D.N.Y. Nov. 12, 2003).

Moreover, in the instant case, prior to this incident the shipper had contracted with MSC for the transportation of other shipments of flower seeds from Tanzania to various ports. (Mecky Aff. at ¶ 3). In all of these prior shipments, MSC carried the cargoes under the same conditions as in the instant case, *i.e.* in holds using only passive ventilation and utilizing the same routing and transshipment aboard multiple vessels, and in none of these prior shipments was any damage to the cargoes ever reported to MSC. (Mecky Aff. at ¶ 3). Further, in all of these prior shipments the shipper never provided MSC with any specific carrying instructions nor requested that MSC employ different routing or utilize mechanical ventilation.[2] (Mecky Aff. at ¶¶ 3-5 and 9).

---

[2] Not that mechanical ventilation would have prevented the sweat condition from occurring. For further discussion of this point, see POINT II, supra.

8

Finally, if the shipper had wanted to ensure that its cargo would be transported under the ideal temperature and humidity conditions it should have utilized a refrigerated ("reefer") container. (Parani Aff. at 10). In a similar case involving containerized cargo, *Empire Distribs., Inc. v. U.S. Lines, Inc.*, the carrier was found not liable because plaintiff had opted against using a reefer container. *Empire Distribs., Inc. v. U.S. Lines, Inc.*, 1986 U.S. Dist. LEXIS 20379, at *12-13 (S.D. Ga. 1986) (holding that the plaintiff "was and is free to opt for shipment of its [cargo] by the most inexpensive means possible, but, having done so, it cannot be heard to complaint of breach of duty on the part of the carrier when the shipper's own decision leads substantially to the loss.")

## POINT IV

## MSC EXERCISED DUE DILIGENCE IN ITS CARRIAGE OF THE CARGO

### A. MSC Satisfied its Due Diligence Obligations Through the Use of Passive Ventilation

Plaintiff's final argument is a rehash of its earlier argument that MSC failed to properly ventilate the subject cargo. Plaintiff argues that the failure to ventilate cargo constitutes "want of diligence" rendering the carrier liable for the resulting damage. (Pltf.'s Mem. at p. 12). In support, plaintiff again cites pre-containerization cases involving non-container and bulk cargoes. As set forth more fully in POINT II above, as per the custom in the industry, MSC provides passive ventilation in its container holds. Therefore, plaintiff's argument on this point is rendered moot.

### B. The Subject Voyage Was Not Excessively Lengthy[3]

---

[3] To the extent that plaintiff is implicitly claiming that the length of the voyage or the use of multiple vessels by MSC constituted an unreasonable deviation, MSC rejects this contention. In the first instance, to claim that an unreasonable deviation has occurred, plaintiff has the burden of establishing that a deviation did occur. Plaintiff cannot meet this burden because the evidence presented by Mr. Mecky establishes that MSC utilized its customary route for the voyage from Tannga, Tanzania to Long Beach, California. Second, plaintiff also has the burden of

9

Case 1:08-cv-00223-JSR    Document 40    Filed 08/28/2008    Page 11 of 13

Plaintiff's final argument is that the shipment of the subject cargo took an unusually long period of time, that the length of the voyage could have contributed to the damage to the subject cargo, and that therefore MSC failed to satisfy its due diligence obligations. (Pltf.'s Mem. at pp. 13-15). Contrary to plaintiff's unsubstantiated assertion[4], however, the evidence indicates that the subject voyage was **not** unusually long but was, in fact, an average voyage. As Dominick Mecky, MSC's agent in Tanzania explains in his Affirmation, the average time to complete a voyage such as the subject voyage is 65-70 days. (Mecky Aff. at ¶ 2). Moreover, prior to the subject shipment, the shipper had used MSC to transport shipments of flower seeds from Tanzania to various European ports and was aware that MSC employed a feeder system which involved numerous vessels and trans-shipment ports. (Mecky Aff. at ¶¶ 2-4). Further, since the subject shipment, the shipper has continued to use MSC to transport shipments of flower seeds from Tanzania to Long Beach, all without incident, and even though one of those voyages took 82 days. (Mecky Aff. at ¶ 8).

In any event, MSC has the right, under clause six of its bill of lading, to ship via the "usual or customary or advertised ports of call whether named in this contract or not," as well as to any "ports in or out of the advertised geographical, usual or ordinary route of order." (Deconinck Aff. at Ex. A). Moreover, under the terms and conditions of the bill of lading, the vessel could call at any port for the purpose of the voyage, call at any port more than once, or omit any port whether scheduled or not.

---

showing that the unreasonable deviation was the proximate cause of the damage. Plaintiff will also be unable to meet this burden since there has been no evidence presented showing where the wetting damage to the cargo occurred, let alone that it occurred during a particular deviation at a transshipment port.

[4] The sole basis of plaintiff's assertion that the voyage was too long is the unsubstantiated statement by Dennis Berri. Interestingly, Berri's Expert Report makes no reference to this issue and, in fact, sets forth no conclusions other than the wetting was due to fresh water. (Flood Aff. at Exhibit A). Recognizing that the vast majority of Mr. Berri's opinions set forth in his affidavits are not contained in his Expert Disclosure, MSC moves that Mr. Berri's affidavits not be considered by the Court in deciding this motion.

10

Further, under clause five of its bill of lading, MSC was at liberty, whether expressly arranged beforehand or otherwise, to "carry out the transport wholly or partly by the said or other vessel or vessels either belonging to the carrier or others … and to transship, land and store the goods either on shore or afloat and reship and forward the same at Carrier's expense but at Merchant's risk." (Deconinck Aff. at Ex. A).

Since the length of the subject voyage was within the ordinary time period for such voyages, and in fact, prior and subsequent voyages of the same cargo have taken place uneventfully, the length of the subject voyage could not have contributed to the sweat damage. Further, MSC's use of transshipment aboard multiple vessels is appropriate and in accord with the custom and practice in the industry, and is expressly permitted under the terms and conditions of MSC's bill of lading.

## CONCLUSION

Accordingly, for the foregoing reasons, MSC respectfully requests that the Court grant its motion for summary judgment against the plaintiff in its entirety, deny plaintiff's motion for summary judgment in its entirety, and grant MSC such other and further relief as the Court deems fit.

Dated: August 28, 2008

                LYONS & FLOOD, LLP
                Attorneys for Defendant
                MEDITERRANEAN SHIPPING
                COMPANY S.A.

                Edward P. Flood (EPF-5797)
                65 West 36th Street, 7th Floor
                New York, New York 10018
                (212) 594-2400

U:\FLOODDOC\2549114\Motions\Reply to Plaintiff's Response\Reply - MOL(revised).doc

## CERTIFICATE OF SERVICE

Erika Tax declares and states that:

I am not a party to these actions, am over 18 years of age and reside in Queens, New York. I am an employee with Lyons & Flood, LLP, attorneys for defendant MEDITERRANEAN SHIPPING COMPANY, S.A., with offices at 65 West 36th Street, 7th Floor, New York, New York 10018.

On August 28, 2008, I served true copies of the Reply Memorandum of Law, Affirmation of Edward P. Flood, Supplemental Affirmation of Captain V.S. Parani and Affirmation of Dominick Mecky in Support of Defendant's Motion for Summary Judgment upon:

>BADIAK & WILL, LLP
>Attorney for Plaintiff
>106 Third Street
>Mineola, New York 11501
>Attn: Alfred J. Will, Esq.
>File No.: 07-J-011-AW

by U.S. Mail, first-class postage pre-paid, addressed to the last known address of the addressees as indicated above.

Executed on: August 28, 2008

_____
Erika Tax

U:\FLOODDOC\2549114\Motions\Reply to Plaintiff's Response\Reply - MOL(revised).doc